FILED
10/18/2022
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 2, 2022 Session

IN RE **KENDALL K.**

**Appeal from the Chancery Court for Robertson County**
**No. CH17-CV-374  Ted A. Crozier Jr., Judge**
_____

**No. M2021-01463-COA-R3-PT**
_____

A father and stepmother sought to terminate the parental rights of a mother to her child. The trial court found clear and convincing evidence that the mother had abandoned her child by willful failure to visit during the four months preceding the filing of the termination petition. But the court found the evidence less than clear and convincing that termination of the mother's parental rights was in the child's best interest. We affirm.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT JR., P.J., M.S., and THOMAS R. FRIERSON II, J., joined.

Kimberley Reed-Bracey Johnson, Goodlettsville, Tennessee, for the appellants, Jeffrey K. and Victoria K.

David L. King and Wende J. Rutherford, Nashville, Tennessee, for the appellee, Haley F.

**OPINION**

**I.**

**A.**

Kendall K. was born to unwed parents, Haley F. ("Mother") and Jeffrey K. ("Father"). When Kendall was almost three years old, Father filed a petition to establish parentage in juvenile court. And he asked the court to adopt a permanent parenting plan naming him primary residential parent. A short time later, Father moved for emergency custody based on Mother's arrest on drug charges.

The juvenile court declared Father to be Kendall's legal father. And it awarded Father temporary primary custody, limiting Mother to two days of supervised parenting time per week. Both parents were subject to random drug testing.

The parents subsequently agreed to a permanent parenting plan. The plan named Father primary residential parent. Both parents had equal parenting time. The plan specified that, beginning December 1, 2015, Mother's parenting time would be unsupervised, provided that Mother remained compliant with her treatment program and passed her drug screens. The juvenile court approved and adopted the agreed plan.

Rather than demonstrating compliance with her treatment program, Mother was arrested on new drug charges. On December 21, 2015, the juvenile court issued an emergency ex parte restraining order suspending Mother's parenting time. Mother was incarcerated from January 5, 2016 to September 29, 2016. So she did not appear at the January 6 hearing on the restraining order.

Based on statements from Father's counsel,[1] the court found good cause for the emergency restraining order to remain in place. The court specified that the restraining order would "remain in full force and effect" until Mother petitioned for a modification.

The court also ordered Mother to pay $200 in temporary child support each month, beginning February 1, 2016, and to continue to pay half the cost of daycare for Kendall. The maternal grandparents paid child support on Mother's behalf while she was incarcerated. They paid Mother's share of daycare expenses through August 2016. And they satisfied her monthly child support obligation through December 2016. Mother paid for daycare in September 2016. But Father did not receive any child support payments from Mother or the maternal grandparents during the first seven months of 2017.

After Mother was released from jail, she moved to set aside the restraining order and reinstate the agreed parenting plan. The court denied her motion as procedurally inappropriate. She then filed a petition to modify her parenting time. In her petition, Mother alleged that she was participating in a Suboxone treatment program, living with her grandmother, and working as a hair stylist. Three months later, Mother withdrew her petition.

Meanwhile, Father married Victoria K. ("Stepmother"). On August 4, 2017, Stepmother, joined by Father, filed a petition in chancery court to terminate Mother's parental rights and to adopt Kendall. The petition, as later amended, alleged four grounds for termination: abandonment by failure to visit; abandonment by failure to support;

---

[1] Mother's attorney withdrew before the hearing began.

2

abandonment by wanton disregard; and failure to manifest an ability and willingness to assume custody or financial responsibility for the child.

B.

Most of the trial occurred in September and November of 2018. The court also heard additional proof in late June 2019. By the time of trial, Father and Stepmother no longer sought to terminate Mother's parental rights on the ground of abandonment by wanton disregard.

Father obtained temporary primary custody of Kendall when she was three. She was six years old at the time of trial. Kendall was described as a healthy, happy child. She did well in school and was involved in a couple of extracurricular activities. According to Stepmother, she and Kendall shared a "special connection." Father agreed. He maintained that Stepmother was "the only mom [Kendall] kn[ew]." According to Father, Kendall no longer talked about Mother. Nor did she ever indicate that she wanted to be with Mother. Father and Stepmother were eagerly anticipating the birth of their first child together, and Kendall was excited to be a big sister.

Other than two "FaceTime" calls, Kendall had not seen or heard from Mother in almost three years. Father interpreted the suspension of Mother's parenting time as a "no contact" order. So he discouraged Mother from seeking any form of contact with Kendall while the order was in effect. Four months before trial, Mother sent Father a text message about Kendall. Other than that, he had not heard from Mother in at least two years.

Yet the maternal grandmother asserted that Mother and Kendall needed each other. Kendall identified Mother in pictures when she was at the maternal grandparents' home. The court also listened to an audiotaped interview between the guardian ad litem and the child. During the interview, the court learned that Kendall called Mother "mommy." Kendall also indicated that she missed Mother and wanted to spend time with her.

Father also reported that Mother did not pay any child support during the four months preceding the filing of the termination petition. At the time of trial, Mother had a child support arrearage of $2,600.

Mother claimed that she paid when she could. While in jail, she authorized the maternal grandparents to use her tax refund to pay her child support obligation. After her release, Mother was only employed for a short period. Transportation issues forced her to quit her job as a hair stylist in early 2017. She had totaled her car. She remained unemployed during the four months preceding the filing of the petition. In August 2017, she sent Father the proceeds from the sale of her totaled car. But he did not receive the funds until after the petition was filed. And she made other lump sum payments after the

3

petition was filed. She thought she had satisfied any arrearage because Father never told her otherwise.

Mother insisted that she never intended to abandon her daughter. She blamed Father for her lack of contact. He told her that she could not have any contact with their daughter. Mother claimed that she bought presents for Kendall, but the child never received them. The maternal grandmother confirmed that she did not deliver Mother's gifts or cards for fear of violating the restraining order.

Mother pointed out that she tried to have the restraining order set aside. But she realized she had to improve herself before the court would allow her to see her daughter. So she withdrew her petition to work on her recovery.

Mother claimed that she stopped her Suboxone treatment for good reason. Suboxone had become "just another substance that I was dependent on, and I had been dependent on something for so long." She believed Vivitrol would be different. And to qualify for Vivitrol treatment, she had to abstain from all drugs, including Suboxone. So she moved to Pulaski to "get away from Nashville and its environment." According to Mother, she had been drug-free since July 15, 2017.

Mother acknowledged her long history of drug addiction. She first used opiates when she was sixteen. In later years, her drug of choice was heroin. She tried multiple drug treatment programs. Yet no matter how many times she relapsed, Mother claimed she "never g[a]ve up on . . . trying to get better."

About a month after the termination petition was filed, Mother went to see Dr. Peter Martin, a psychiatrist specializing in addiction, about receiving Vivitrol treatment. In videotaped testimony, Dr. Martin explained that Vivitrol was not a substitute for opioids like Suboxone. It did not give patients "that same sense of comfort." Nor did it prevent withdrawal symptoms. Rather, it blocked the opioid receptor in the brain. To receive Vivitrol, the patient must be "totally clear of opioids." If not, the patient "could get very sick." In Dr. Martin's experience, "only really motivated patients" wanted to be on Vivitrol.

Vivitrol is administered through monthly injections. Mother had to pass a drug screen before each shot. According to Dr. Martin's records, she had not missed any shots. Nor had she failed a drug screen. He described her as "meticulous about getting her shots." If she had missed a shot, he would have eliminated her from the program.

Dr. Martin also saw Mother for periodic therapy sessions. From his interactions with her, Dr. Martin believed Mother's life was "coming together." After almost a year of treatment, his diagnosis was "opioid use disorder, severe, in sustained remission due to

4

medication treatment." Dr. Martin asserted that "as long as [Mother] continues with the treatment, she will stay sober."

In November 2017, Mother moved into Hope Homes, a sober living facility in Nashville. The next month, she began an intensive outpatient treatment program at Foundations. Her primary therapist recalled that Mother completed 25 weeks of individual and group therapy sessions. She also attended NA meetings. She never failed a drug screen administered at Foundations. And she successfully completed the program at the end of February 2018.

In March 2018, Mother left Hope Homes and moved into her own apartment. The maternal grandmother described the apartment as clean and suitable for Kendall. Mother also worked full time as a hair stylist, making $10 per hour plus tips. Her manager had no issues with Mother's job performance.

Mother proudly announced that, with the help of Vivitrol, she had turned her life around. She believed she was fit to be a part of Kendall's life. The maternal grandmother agreed, explaining that she saw a "100% change" in Mother's life. She recognized that Mother had relapsed before. But she insisted that this time was different.

Father and Stepmother asserted that Mother had not yet demonstrated enough stability to be a part of Kendall's life. In their view, Mother was not fit to have any contact with Kendall until she could prove "that she's going to be consistent and stay clean." Dr. Martin's medical records indicated that Mother smoked marijuana in September 2017.[2] And she lied in her deposition about the reason she left Hope Homes. During her deposition, Mother denied that she was kicked out of Hope Homes. Several months later, she corrected her testimony, clarifying that she had left because she failed a urine drug screen. Mother insisted that the positive test result was incorrect. While she was given an opportunity to take an "immediate blood test," she claimed that she was unable to obtain the necessary test within the prescribed time period. So she moved.

Father and Stepmother also questioned Mother's relationship with Josh Caldwell, a convicted felon. Mother moved in with Mr. Caldwell in early 2017. While living with him, she was arrested twice on unspecified charges. She pleaded guilty to shoplifting and was sentenced to probation.

Mother acknowledged that Mr. Caldwell was not the most "ideal" choice for a roommate. But he helped her "through a dark time." He gave her a place to live without "opiates around." Mother admitted that she saw him "from time to time" after her return to Nashville. Mother knew that contact with a known felon could violate her probation.

---

[2] At trial, Mother denied using marijuana.

But she insisted that she told her probation officer about Mr. Caldwell. And she had not been notified of any adverse consequences. Mother ended the relationship in April 2019.

Father and Stepmother also established that Mother was arrested again in September 2018 for theft, trespassing, and criminal impersonation. She pleaded guilty to misdemeanor theft and criminal impersonation and received probation. Mother expressed regret for her bad decisions. As she explained, "I'm still working on myself."

The trial court found that there was clear and convincing evidence to support one ground for termination: abandonment by failure to visit. But the court concluded that Father and Stepmother failed to prove that termination of Mother's parental rights was in Kendall's best interest.

## II.

A parent has a fundamental right, based in both the federal and state constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. The government's interest in the welfare of a child justifies interference with a parent's constitutional rights in certain circumstances. *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2022).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind

6

regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); TENN. R. APP. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

## A.

On appeal, Father and Stepmother contend that they established two additional grounds for termination of Mother's parental rights. They also complain that the trial court erred in its assessment of Kendall's best interest. In examining these contentions, we apply the versions of the parental termination statutes in effect on the date the petition to terminate parental rights was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017) (holding "that the version of the statute in effect at the time of the [parental termination] petition's filing controls this action").

### 1. Abandonment by Failure to Visit and Support

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1) (2017). The parental termination statutes provide alternative definitions for "abandonment." *Id.* § 36-1-102(1)(A) (2017). One definition of "abandonment" includes "the willful failure to visit, to support, or to make reasonable payments toward the support of the child during the four-month period preceding the filing of the petition to terminate parental rights."[3] *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *see also* Tenn. Code Ann. § 36-1-102(1)(A)(i). Here, because the petition to terminate parental rights was filed on August 4, 2017, the relevant four-month period is April 4, 2017 to August 3, 2017, the day before the petition was filed. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period).

---

[3] As of July 1, 2018, parties seeking termination of parental rights no longer have to prove a parent's failure to support or to visit was willful. 2018 Tenn. Pub. Acts 1088. Under the current version of the statute, the parent or guardian must raise and prove the defense of "absence of willfulness." Tenn. Code Ann. § 36-1-102(1)(I) (Supp. 2022).

7

To terminate parental rights on the ground of abandonment, the court must find the abandonment to be willful. While the failure to visit or support presents a fact question, whether that failure is willful presents a question of law. *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). A "[f]ailure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005).

a. Willful Failure to Visit

The trial court concluded that Mother willfully failed to visit the child during the relevant four-month period. Neither party has challenged this. But we still must review the trial court's findings as to this ground for termination. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016).

Mother admitted that she did not visit the child during the relevant time period. But she contended that her failure to visit was not willful. Our supreme court has stated that "a parent who attempt[s] to visit and maintain relations with his child, but [i]s thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child." *In re Adoption of A.M.H.*, 215 S.W.3d at 810.

Mother blamed Father for her lack of contact with Kendall. A parent's attempts at visitation are obstructed when another person's conduct creates "a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *In re Audrey S.*, 182 S.W.3d at 864. But Mother never tried to contact the child. She only sent a few cards and presents to the maternal grandparents, which were not delivered. *See In re Mackenzie N.*, No. M2013-02805-COA-R3-PT, 2014 WL 6735151, at *8 (Tenn. Ct. App. Nov. 26, 2014) (noting that the parent's efforts to contact the child are relevant to whether another person's conduct represented a "significant restraint").

Nor did she actively pursue her legal remedies. A parent has not willfully abandoned a child if the parent is "actively trying to maintain visitation." *In re Adoption of Angela E.*, 402 S.W.3d at 642. In the almost two years that the restraining order had been in place, Mother only made two half-hearted attempts to regain visitation. Notably, she voluntarily dismissed her juvenile court petition before it was heard. Mother claimed that she dismissed her petition so that she could focus on her recovery. While this was a laudable goal, she made no further attempts to re-establish visitation until after the petition was filed. Mother's failure to act was willful. *See In re Audrey S.*, 182 S.W.3d at 863.

Based on this record, we conclude that the evidence was clear and convincing that Mother abandoned her child by willful failure to visit during the four months preceding the filing of the petition.

8

b. Willful Failure to Support

Father and Stepmother contend that Mother also abandoned Kendall by failure to support. It is undisputed that Mother paid no child support during the four months before the petition was filed. But simply proving that Mother did not make any payments during the relevant period is not enough. *See In re Keri C.*, 384 S.W.3d 731, 746 (Tenn. Ct. App. 2010). Father and Stepmother also had the burden to prove that Mother's failure to pay was willful. *See id.*

Mother was aware of her duty to support her child. But she was unemployed during the relevant period. A parent's failure to support a child is not willful if the parent is financially unable to do so. *In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *6 (Tenn. Ct. App. Aug. 4, 2014) (citing *Pierce v. Bechtold*, 448 S.W.2d 425, 429 (Tenn. Ct. App. 1969)).

Nor is there any evidence that Mother was willfully unemployed. *See In re Mattie L.*, 618 S.W.3d 335, 346 (Tenn. 2021) ("Willful unemployment can be construed as a willful failure to support."). Mother explained that she was forced to quit her job because she lacked transportation. Father and Stepmother presented no contrary evidence. *Cf. In re Laura F.*, No. M2017-01767-COA-R3-PT, 2019 WL 1896560, at *7 (Tenn. Ct. App. Apr. 29, 2019) (finding willful unemployment where the mother told her sister that "she did not want to work because she did not want to pay child support"); *In re Jamie G.*, No. M2014-01310-COA-R3-PT, 2015 WL 3456437, at *14 (Tenn. Ct. App. May 29, 2015) (concluding that a mother willfully abandoned her child when she intentionally failed to follow through with employment opportunities); *In re M.P.J.*, No. E2008-00174-COA-R3-PT, 2008 WL 3982912, at *10 (Tenn. Ct. App. Aug. 27, 2008) (concluding that a father's unemployment was voluntary when he declined offered employment).

We conclude that the evidence is less than clear and convincing that Mother willfully abandoned her child by failure to support. Father and Stepmother had the "burden to prove [Mother] was able but unwilling to work." *See In re Mattie L.*, 618 S.W.3d at 347. They failed to do so.

2. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility

The trial court found that the petitioners failed to prove that termination of parental rights was appropriate under Tennessee Code Annotated § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he or she

[1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody

9

would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). Both prongs must be established by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). As to the first prong, the petitioner may prove that a parent is either unable or unwilling to "assume legal and physical custody or financial responsibility of the child." *Id.* at 677.

Father and Stepmother emphasize Mother's pre-petition behavior. In their view, she failed to take the necessary steps to create stability for the child in a timely manner. The most relevant time period for this ground is the time preceding the filing of the petition to terminate parental rights. *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *7 (Tenn. Ct. App. Apr. 23, 2020). At that time, Mother was clearly unable to assume custody or financial responsibility for Kendall. She was unemployed and lacked reliable transportation and stable housing. She had also stopped her Suboxone treatment.

But we may also consider the parent's actions after the petition was filed. *See In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. April 4, 2018). Mother started Vivitrol treatment a month after the petition was filed. She moved into a sober living facility and completed an intensive outpatient treatment program. She also found a steady job and resumed paying child support. Several witnesses confirmed Mother's testimony about her newfound sobriety. By the last day of trial, Mother had been drug-free for almost two years. She still saw Dr. Martin. She also attended NA meetings. She had resolved her pending criminal charges and was not in violation of her probation. She earned a steady income and had a suitable home. She had also ended her relationship with Mr. Caldwell. Unlike Father and Stepmother, we do not view Mother's efforts here as too little or too late.

Mother made some bad choices after the petition was filed. Parents with drug addictions can "have false starts and set backs, as well as successes and, regrettably, backsliding," and we should take that into account. *In re M.J.M., Jr.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302, at *11 (Tenn. Ct. App. Apr. 14, 2005), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d at 555. The court credited the testimony that Mother had worked hard and turned her life around. We find no basis in this record to disturb that credibility assessment. *See Coleman Mgmt., Inc. v. Meyer*, 304 S.W.3d 340, 348 (Tenn. Ct. App. 2009). Given Mother's sustained improvement, we find the evidence less than clear and convincing that Mother failed to manifest an ability or willingness to assume custody or financial responsibility for her child. *See In re Kyland F.*, No. E2019-01058-COA-R3-PT, 2020 WL 957647, at *8-9 (Tenn. Ct. App. Feb. 27, 2020).

In light of Mother's newfound stability, the court found that placing the child in Mother's custody would not pose a risk of substantial harm to her psychological welfare. At the time of trial, Mother and Kendall had been separated for three years. By all accounts,

Kendall is thriving in her current home.  Returning children to the custody of a virtual stranger carries a risk of substantial harm. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at \*17 (Tenn. Ct. App. July 22, 2020) (reasoning that returning the child to a "virtual stranger" in light of her strong bond with her current caregivers would constitute substantial harm).  But here, the proof showed that Kendall missed Mother and wanted to spend time with her.  So we conclude that the evidence is also less than clear and convincing that returning Kendall to Mother's custody would pose a risk of substantial harm.

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005).  So even if a statutory ground for termination is established by clear and convincing evidence, we must also determine whether termination of parental rights is in the child's best interests.  Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts must consider in making a best interest analysis.[4]  The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017).  In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682.  The best interest analysis is a fact-intensive inquiry, and each case is unique. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499.  The analysis should consider "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at \*6 (Tenn. Ct. App. June 26, 2006).  Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[ ] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535.

After considering the statutory factors, the trial court concluded that termination of Mother's parental rights was not in Kendall's best interests.  Father and Stepmother contend that the court erred in its analysis of the statutory factors.  In their view, the evidence overwhelmingly favored termination.

---

[4] Effective April 22, 2021, a court has a twenty-factor list to consider in determining a child's best interest.  2021 Tenn. Pub. Acts 509.

11

The first two statutory factors look at the parent's current lifestyle and living conditions. The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the [parent's] home." Tenn. Code Ann. § 36-1-113(i)(1). The second factor considers the potential for a lasting change. *Id.* § 36-1-113(i)(2). The court found that Mother had "made significant strides in her quest to maintain a drug free lifestyle." By the last day of trial, she had been drug free for almost two years. Both her treating physician and her therapist testified about Mother's efforts to overcome her drug addiction. She was "meticulous" in getting her monthly Vivitrol shots. She had not failed any drug screens in Dr. Martin's office or at Foundations.

Father and Stepmother argue that there is some evidence that Mother continued to use illegal drugs. They also emphasize Mother's misdemeanor convictions in September 2018. Mother acknowledged her struggles with addictive behaviors. And the proof on the final day of trial was that Mother was compliant with her probation and had incurred no new criminal charges. Overall, the evidence does not preponderate against the court's finding that Mother had made a lasting change. The first two factors favor Mother.

The court also considered the third and fourth factors, which concern the parent's relationship with the child. The third factor focuses on the consistency of visitation. *Id.* § 36-1-113(i)(3). The fourth factor considers "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4). Given Mother's lack of contact with Kendall, the court found that both of these factors favored termination.

The fifth factor evaluates the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). The court recognized that Father and Stepmother provided much needed stability for Kendall. Yet there was evidence that Kendall missed Mother and wanted to see her. She was aware of Mother's identity. She identified Mother in pictures at the maternal grandparents' home. Under these circumstances, the court could not find that it would be detrimental for the child to have a relationship with Mother. The evidence does not preponderate against these findings.

In analyzing the fifth factor, the court noted that a relationship with Mother was important for Kendall's emotional and psychological wellbeing. Father and Stepmother complain that there was no evidence presented at trial about the child's need for a relationship with her biological mother. But the maternal grandmother testified that Mother and Kendall needed each other. And Kendall expressed an interest in spending time with Mother. Our state statutes recognize the "fundamental importance of the parent-child relationship to the welfare of the child." *Id.* § 36-6-401(a).

12

The court found that the sixth factor was not applicable because there was no evidence that Mother had abused or neglected the child. *See id.* § 36-1-113(i)(6). Father and Stepmother contend that Mother's history of drug addiction amounted to child neglect. The evidence here does not rise to the level of abuse or neglect.

The court also considered the seventh factor, which focuses on the parent's home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner."). As the court found, Mother made significant progress in the two years since the petition was filed. She addressed her drug addiction. She was employed and had a stable home. She resolved all pending criminal charges. She ended her relationship with Mr. Caldwell. As of the last day of trial, Mother had not been charged with a probation violation. The evidence does not preponderate against the court's findings. This factor favors Mother.

As for the eighth factor, the court found no proof that Mother's mental or emotional status would be detrimental to the child. *See id.* § 36-1-113(i)(8). Dr. Martin testified that any initial emotional problems he noted had resolved with treatment. Father and Stepmother highlight Mother's past behaviors and the risk of another relapse. But as of the last day of trial, Mother had remained compliant with her Vivitrol treatment for almost two years. This factor favors Mother.

The ninth factor looks at the parent's child support history. *Id.* § 36-1-113(i)(9). The trial court found this factor was neutral. Mother had paid a significant amount of child support since the petition was filed, but she still had an outstanding arrearage. The evidence does not preponderate against these findings.

We conclude that the evidence is less than clear and convincing that that termination is in Kendall's best interest. The best interest analysis involves "a delicate balance between the substantial need to provide the child stability and the interest of the child in maintaining a relationship with his or her biological family." *In re Wesley P.*, No. W2014-02246-COA-R3-PT, 2015 WL 3430090, at *13 (Tenn. Ct. App. May 29, 2015). Mother made significant strides in the two years that elapsed between the filing of the termination petition and the final day of trial. Father and Stepmother remain unconvinced that Mother has overcome her drug addiction. Lacking a crystal ball, we cannot be sure that Mother's positive changes will last. But the mere possibility that Mother could relapse and resume her previous behavior "does not amount to clear and convincing evidence that termination is in the [child's] best interests." *In re Gabriella D.*, 531 S.W.3d at 686.

While Mother may not be ready to resume her role as parent today, that is not the issue before us. *See In re C.B.W.*, 2006 WL 1749534, at *8 (explaining that the denial of a petition to terminate parental rights does not automatically return a child to the parent's

13

custody). We only conclude that Father and Stepmother failed to prove, by clear and convincing evidence, that terminating Mother's parental rights was in the child's best interest.

## III.

The record contains clear and convincing evidence to support terminating Mother's parental rights based on abandonment by failure to visit. Father and Stepmother failed to establish any other grounds for termination. But, like the trial court, we conclude that the evidence is less than clear and convincing that termination is in the child's best interest. So we affirm.

            s/ W. Neal McBrayer
            W. NEAL MCBRAYER, JUDGE